Mr. Justice CATRON
 

 delivered the opinion of the court.
 

 The question in the Supreme Court of Louisiana was- one of boundary. The court passed on the grant to Dupard only,-and not on the opposing claim: if the lines of the former did not open in their production from the Mississippi, towards Lake Maurepas, then the land claimed under Millaudon’s title was not embraced by Dupard’s grant, and no necessity existed for the examination of Millaudon’s. Dupard’s. was made in 1769, “for thirty arpens of front to the river Mississippi, upon the whole depth that shall bé found, unto Lake Maurepas,-of the land where heretofore were two villages of the Collapissa savages; to take from the plantation of one AUemand, unto its junction with that of a person named Joseph Lacombe.” The front being ascertained, the-court below held that, the extension back must be on parallel lines. As this construction excluded the land claimed by Millaudon, it ended the controversy in his favour. .
 

 Did this final judgment draw in question the construction -of a treaty or statute of the United. States; or of an authority exercised
 
 *705
 
 under the same: and was the decision'against the validity of either; or against the title, or right set up or claimed under either? If these questions are answered in the negative, it follows we have no jurisdiction to re-examine, or reverse the judgment under the 25th section of the Judiciary
 
 Act;
 
 as no other error is within the cognisance
 
 Of
 
 this court.
 

 1. The treaty with France, of 1803, gave.mo further sanction to the boundary of McDonogh’s title than it had by the grant; in respect to its validity, the decision of the state court supported the claim to the same extent that the treaty protected it, and therefore the decision was not opposed to the treaty. A question partly involving this consideration was adjudged in The City of NewOrleans,
 
 v.
 
 De Armas, 9 Peters, 225, to which we refer.
 

 2. Was the decision of the. Supreme Court of Louisiana opposed to any act of Congress ? Dupard’s grant was completed as early as 1769, and presented to the register, arfd receiver as a complete
 

 . title; was thus reported on by them to the General Land-office, and by that department the report was laid before Congress ; it is as follows:
 

 “No. 406.
 

 “John McDonogh & Company claim a tract of land situated in the county of Acadia, on the east shore of the river Mississippi, sixteen leagues above New Orleans, containing thirty-two arpens front, with a depth extending as far as Lake Maurepás.
 

 “ This tract of land has formerly been claimed before the board of commissioners,, and, the depth extending beyond forty acres, rejected by them, for want of evidence of title; but' the claimant has -since produced a complete French title to the whole quantity claimed, in favour of Pierre Dejille Dupard, (under whom he claims,) dated 3d day of April, 1769.”.
 

 On the report at large, embracing many claims, Congress proceeded ; and by the act of May 11th, 1820, declared, “ that the claims to lands within the eastern district of Louisiana, described by .the register and receiver of said district in their report to the commissioner of- the General Land-office,^ bearing date the 20th day of November, 1816, and recommended in said report for confirmation,be, and the same are hereby confirmed, against any claim on part of the United Státes.’’
 

 McDonogh’s claim, No. 406, is of class first, species first, in the report, including twenty-one grants, of which the. register and receiver say: “ All the preceding claims, being founded on complete titles, are in our opinion confirmed by law.” 3 Am. State Papers, 255. This is explained in page 267, where it is again said: “ Those claims which are found under species first of the first class, being founded on complete grants of former governments, we think are good in themselves on general principles, and therefore require no
 
 *706
 
 confirmation by the government of the United States to give them validity.”
 

 ■ Many incopiplete titles were recommended for confirmation, and confirmed by Congress, but in these cases the former governments had not parted with the ultimate interest in-the land,, and the fee was transferred to the United States by the treaty, with the equity attached in the claimant,, which equity was clothed with the fee1 by the confirming act. The perfect title of McDonogh being clothed with the highest sanction, and in full property, on the change of governments an'assumption to confirm.it would have been pregnant with suspicion that it required confirmation by this government, in addition to the general law of nations and the treaty of 1803, which secured in foil property such titles. That the grant stands recognised as complete and valid against, the UnitecI States, and any one claiming under them, by the proceedings'had before the register and receiver and by Congress, we have no doubt; further .than this, the government has not acted - on i.t. In such sense similar titles have been treated, as will be seen bythe'two acts of May 8th, 1822 — the first confirming lots in the town of Mobile and claims, in West Florida.; the second, sanctioning the reports of the registers and receivers .of the land-offices at St. Helena Court 'House and at Jackson Court House, in the districts east and west of Pearl -river; in regard to which reports, Congress says: That all complete titles (reported on ■ as such) be, and ithe same are, recognised as valid and complete agáinst the United States, or, any right derived under them.
 

 But in McDonogh’s case, as in other similar ones, referred to above,- the recognition extended only to the boundaries the grants themselves furnished, according to their landmarks, and true construction' under , the local laws in virtue of which they were obtained.
 

 3. To overcome this objection, it is insisted,- on the' part of the plaintiff in error, that. McDonogh & Company filed plans of survey and descriptions of the. land with the register and receiver, and especially that of F. V. Potier, as part of their title, giving the boundaries as they were claimed before the Supreme Court of Louisiana; that these were confirmed by Congress; that the confirmation, .to the extent it was made, is binding on the United States,' as the opposing claim of Millaudon was not drawn in controversy below, and the lands claimed-treated as unappropriated, by individuals.
 

 If-the fact assumed was true, that thé plans and descriptions had been confirmed,'and boundary given to the title according to them by the United States, then the decision would be .opposed to the confirmation, and jurisdiction exist in this court.
 

 There can be no doubt such .plans and descriptions were filed and . recorded in due time, but no evidence is found in the record that the register and receiver acted' on them; or that they were presented to Congress even as documents accompanying the report; if they were, it is' manifest that they were disregarded, for two rea
 
 *707
 
 sons: first, because Congress did not' assume the power to deal directly with this title at all; and, secondly, because the report had reference' singly to .the face of the grant, regardléss of private surveys made subsequent to its date, at the instance of the successive owners.
 

 The state court held McDonogh’s title to' be valid to every extent that it has been recognised-by the United States, and only applied the local laws of Louisiana in its construction, so far as they had a controlling influence on the-manner in whi'ch the side lines should be fextended from the Mississippi river towards Lake Maurepas; and as,, in so doing, neither the treaty of 1803, nor any act of Congress; or authority exercised under the United States, was drawn in question, this' court has no jurisdiction to revise the decision of that court; for which reason, the-cause must be dismissed.
 

 The clerk of the Supreme Court of Louisiana issued the writ of error,.and one of the judges) of that court-signed the citation; and, on the ground that such writ could not remove the record, it was moved on a former day of the term to dismiss the cause. It has been here for two terms; a writ of certiorari has been sent down, at the'instance of the defendant in error, in whose behalf,the motion is made, to complete the record; he now moves to dismiss for the first time, and we think he comes too late. If errors had been assigned by the plaintiff here, and joined by the defendant, no motion to dismiss for such a cause could be heard; and as no formal errors are usually assigned in this court, and none were assigned in this cause, wé think ..the delay to make the motion is equal to a joinder in error, even if the clerk of the Supreme Court of Louisianá had no authority to issue the Writ, on which we at present express no opinion.