### LONG v. FARMERS' STATE BANK.

#### (Circuit Court of Appeals, Eighth Circuit. June 25, 1906.)

#### No. 2,381.

1. COURTS—CIRCUIT COURT OF APPEALS—ERROR TO DISTRICT COURT—WRIT OF ERROR—ISSUANCE—TESTE.

Judiciary Act May 8, 1792, c. 36, § 9, 1 Stat. 278, made it the duty of the clerk of the Supreme Court to transmit to the clerks of the several courts the form of a writ of error as approved by two justices of the Supreme Court. The form adopted prescribed that the writ should be issued in the name of the President, attested by the Chief Justice and the clerk of the Supreme Court, Rev. St. § 1004 [U. S. Comp. St. 1901, p. 713], declared that such writs of error may also be issued as well by the clerks of the Circuit Courts, under the seals thereof, as by the clerk of the Supreme Court. *Held*, that a writ of error sued out of the United States Circuit Court of Appeals to a United States District Court should run in the name of the President and be attested by the Chief Justice of the Supreme Court and by the clerk of the Circuit Court.

2. SAME—DEFECTS—AMENDMENT.

That a writ of error was attested by the judge of the Federal District Court and by the District Court clerk was a defect which was amendable, as provided by Rev. St. § 1005 [U. S. Comp. St. 1901, p. 714].

3. WRIT OF ERROR—MOTION TO DISMISS—TIME.

Where a motion to dismiss a writ of error was not filed until within two days of the time when the cause was set down for hearing, and after defendant had filed a brief taking issue on the assignment of errors, the motion was too late.

[Ed. Note.—For cases in point, see vol. 3, Cent. Dig. Appeal and Error, §§ 3149–3154.]

4. INSURANCE—ASSIGNMENT OF POLICIES.

A debtor agreed with his bank to carry $7,000 insurance on his stock as a protection of the bank's claim against him; the contract providing that the debtor assigned thereby such amount of insurance to the bank as collateral security for his indebtedness to the bank. *Held*, that such instrument did not constitute an assignment of the policies in præsenti, but was at most an executory agreement to create a lien on the fund to arise in case of loss and collection from the insurance company.

[Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, § 483.]

5. BANKRUPTCY—PREFERENCES—TRANSFERS—TIME.

Bankr. Act July 1, 1898, c. 541, § 3, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422], declares that acts of bankruptcy shall consist of the bank-

rupt's having (2) transferred, while insolvent, any portion of his property with intent to prefer the transferee. Subsection "b" declares that a petition may be filed against an insolvent, who has committed an act of bankruptcy, within four months after the commission of such act, the time to expire four months after the date of the recording or registering of the transfer, if by law such recording or registering is required or permitted, or if not, from the date when the beneficiary takes notorious, exclusive, and continued possession of the property, unless the creditors have received actual notice of the transfer. Section 60 (30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]) provides that a person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, made a transfer of any of his property, the effect of which is to enable a creditor to obtain a greater percentage of his debt, and that, where the preference consists in a transfer, the period of four months shall not expire until four months from the date of registering, if registration is required. *Held*, that where there had been no effective transfer of certain insurance money to a bankrupt's creditor until the money was turned over by the bankrupt to the creditor, which was within four months prior to the filing of a bankruptcy petition, the amount so paid constituted a voidable preference.

In Error to the District Court of the United States for the Southern District of Iowa.

E. D. Perry (J. R. Plummer, W. A. Spurrier, and E. C. Mills, on the brief), for plaintiff in error.

William M. Jackson, for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The defendant in error has filed a motion to dismiss the writ of error on the ground that it does not bear the teste of the proper officers. While the writ runs in the name of the President of the United States, it is attested by "the Honorable Smith McPherson, Judge of the District Court," and by "Wm. C. McArthur, Clerk of the District Court." By the ninth section of the original judiciary act it was made the duty of the clerk of the Supreme Court to transmit to the clerks of the several courts the form of a writ of error as approved by two Justices of the Supreme Court. The form thus adopted prescribed that the writ should be issued in the name of the President of the United States and have the teste of the Chief Justice and the clerk of the Supreme Court. This was followed by the act of Congress approved May 8, 1792 (1 Stat. 278, c. 36, § 9), now section 1004, Rev. St. [U. S. Comp. St. 1901, p. 713], which prescribes that such writs of error may also be issued "as well by the clerks of the Circuit Courts, under the seals thereof, as by the clerk of the Supreme Court." As this is the only statute applicable, it is uniformly ruled in the federal jurisdiction that writs of error must issue in the name of the President of the United States, attested by the Chief Justice of the Supreme Court and the clerk of the Circuit Court. Bondurant v. Watson, 103 U. S. 278, 26 L. Ed. 447; Ex parte Ralston, 119 U. S. 613, 615, 7 Sup. Ct. 317, 30 L. Ed. 506; Cotter v. Alabama G. S. R. Co., 61 Fed 747, 10 C. C. A. 35.

Notwithstanding the irregularity of the writ in question the mo-

tion should not prevail: (1) Because such defect is amendable under section 1005, Rev. St. U. S. [U. S. Comp. St. 1901, p. 714]. Texas & Pacific Railway Company v. Kirk, 111 U. S. 486, 4 Sup. Ct. 500, 28 L. Ed. 481; Miller v. Texas, 153 U. S. 537, 14 Sup. Ct. 874, 38 L. Ed. 812; Cotter v. Alabama G. S. R. Co., supra. (2) Because the motion to dismiss comes too late. It was not filed until within two days of the time this cause was set down for hearing, and after the defendant in error had filed brief taking issue on the assignment of errors. In McDonogh v. Millaudon et al., 3 How. 693, 707, 11 L. Ed. 787, 794, Mr. Justice Catron, after adverting to the length of time the case had been in the Supreme Court before the motion to dismiss for a like infirmity in the writ of error, said:

"If errors had been assigned by the plaintiff here, and joined by the defendant, no motion to dismiss for such a cause could be heard; and as no formal errors are usually assigned in this court, and none were assigned in this cause, we think the delay to make the motion is equal to a joinder in error, even if the clerk of the Supreme Court of Louisiana had no authority to issue the writ," etc.

The motion to dismiss is therefore denied.

Passing to the merits of the case, we find that the controversy grows out of the following state of facts: On the 31st day of December, 1903, Thomas F. Wells, doing a small mercantile business at Clearfield, Iowa, being indebted to the defendant in error, the Farmers' State Bank of said town, signed and delivered to said bank the following instrument of writing:

"For the purpose of securing financial assistance and credit of the Farmers' State Bank of Clearfield, Iowa, and as collateral security for overdraft and two promissory notes dated this 31st day of December, 1903, one for $700.00 and the other for $4,000.00, bearing 8 per cent. per annum interest from date and due in 6 months and 3 months, respectively, I agree with aforesaid bank to dispose of my stock of goods at earliest conveniences and pay to aforesaid bank the proceeds from such sale, sufficient to satisfy my indebtedness to it.

"I further agree to carry in the aggregate $7,000.00 insurance on aforesaid stock of goods in my possession in building on lot 3, block 14, original town of Clearfield, Iowa, as protection for aforesaid claims, and assign by these presents aforesaid amount of insurance to the Farmers' State Bank as collateral security for the aforesaid indebtedness, said insurance, or amount sufficient to liquidate my indebtedness to aforesaid bank, to be applied for this purpose in case of loss by fire.

"The aforesaid T. F. Wells hereby agrees not to accept settlement for loss for an amount less than sufficient to satisfy claim of the Farmers' State Bank without the approval of the latter; the aforesaid Farmers' State Bank granting the aforesaid T. F. Wells the right to settle with insurance companies in case of loss, as its agent."

Though not affirmatively shown, it may be inferred that at that time Wells had taken out on his stock of goods fire insurance to the amount of about $7,000. It does not appear that the bank thereafter extended any further credit to Wells. The actual possession of the insurance policies remained thereafter with Wells. On June 22, 1904, the entire stock of goods so insured was destroyed by fire, whereby said Wells was rendered insolvent. On the 28th day of June, 1904, he compromised his claim of loss against the insurance company at

$5,075, which sum he collected and paid over to said bank in liquidation of his indebtedness to it. Within four months thereafter, to wit, October 13, 1904, three petitions in involuntary bankruptcy were filed against Wells in the United States District Court for the Southern District of Iowa. Pending these petitions in involuntary bankruptcy he filed a voluntary petition, on which he was adjudged a bankrupt October 28, 1904. After the election and qualification of the plaintiff in error as trustee in bankruptcy he instituted suit against said bank to recover the sum so paid to it by the insolvent, on the ground of it being a voidable preference under the bankrupt act. On the assumption that the alleged assignment took effect and became operative on the 13th day of December, 1903, the District Court directed the jury to return a verdict for the bank, which being done the court dismissed the petition. To reverse this action of the court the plaintiff prosecutes this writ of error.

The first question to be considered is, what is the legal import of the alleged contract between Wells and the bank? Reduced to its practical sense it is this: Wells agreed to carry $7,000 insurance on the stock of goods as a protection of the claim of the bank against him, "and assign by these presents the aforesaid amount of insurance to the Farmers' State Bank as collateral security for the aforesaid indebtedness." It does not purport to assign the policies of insurance, but agrees to assign an amount as collateral security sufficient to liquidate the indebtedness to the bank, "to be applied for this purpose in case of loss by fire." By the last paragraph it was clearly contemplated by the parties that Wells should retain possession of the policy, and in case of loss he should make the proofs, settle with and collect from the insurance company, and pay over so much of the amount collected as would be sufficient to liquidate the debt to the bank, with authority to compromise with the insurance company, but at a sum not less than the amount of the bank's claim against him. Clearly this did not constitute an assignment of the policies in præsenti. This contract was no more than the personal agreement or undertaking of Wells that he would keep the property insured, and in case of loss he would collect and pay over to the bank sufficient to liquidate the debt. The contract conveyed nothing. At most it was but an executory agreement to create a lien upon a fund to arise in case of loss and collection made from the insurance company, when for the first time an equitable lien on the fund would attach. In other words, its effect was a direction to pay in case of loss. Such an agreement, while enforceable inter partes, was not binding upon either the insurer or those claiming an interest under the insured without notice of such lien. Ellis et al. v. Kreutzinger et al., 27 Mo. 311, loc. cit. 314, 72 Am. Dec. 270.

In Christmas v. Russell, 14 Wall. 69, 84, 20 L. Ed. 762, 764, Mr. Justice Swayne, speaking for the court, said:

"An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment. A covenant in the most solemn form has no greater effect. The phraseology employed is not material provided the intent to transfer is manifested. Such an intent and its execution are indis-

pensable. The assignor must not retain any control over the fund, any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund holder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fund holder is bound from the time of notice."

In the later case of Trist v. Child, 21 Wall. 441, 22 L. Ed. 623, the court expressed this same principle as follows:

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. * * * But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund pro tanto, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor."

There is no proof in this case tending to show that either the insurance company or any creditor of the insured had any notice of this agreement. On the other hand, if the view be tenable that the agreement as between Wells and the bank created an equitable lien upon the fund when collected from the insurance company, the question arises, when did this lien become operative in view of the provisions of the bankrupt act? Was it on the 13th day of December, 1903, the date of the alleged contract for transfer, or on the 28th day of June, 1904, the date of the payment of the money? At the former date Wells was solvent. At the latter date he was insolvent. This question is to be solved alone by the provisions of the bankrupt act. Section 3 of the act declares that:

"Acts of bankruptcy by a person shall consist of his having * * * (2) transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors."

Subsection "b" of said section provides that:

"A petition may be filed against a person who is insolvent and who has committed an act of bankruptcy within four months after the commission of such act. Such time shall not expire until four months after (1) the date of the recording or registering of the transfer or assignment when the act consists in having made a transfer of any of his property with intent to hinder, delay, or defraud his creditors or for the purpose of giving a preference as hereinbefore provided, * * * if by law such recording or registering is required or permitted, or, if it is not, from the date when the beneficiary takes notorious, exclusive, or continuous possession of the property unless the petitioning creditors have received actual notice of such transfer or assignment." Act July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422].

Section 60 of the act declares that a person shall be deemed to have given a preference if, being insolvent—

"He has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in the transfer, such period of four months shall not expire until four months after the date of the recording or registering of the trans-

fer, if by law such recording or registering is required." 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445].

And such transfer is made voidable at the suit of the trustee to recover the property so transferred or its value. Said provisions of sections 3 and 60 are to be read together. When so read there can be no permissible question but that the date of the preference referred to in section 60 is the same as that referred to in section 3b, which, as applied to the facts of this case, is the date when the transferee takes possession of the property, unless the instrument under which the claim is made antedated the four months' period and was recorded prior thereto, if authorized to be recorded under the local statute, or if not so entitled then from the date the beneficiary takes notorious, exclusive possession, unless the creditors of the bankrupt had actual notice of the alleged contract. There is no pretense made in this case of any such disclosure. There was, therefore, no effective transfer of this property under the bankrupt act until June 28, 1904, when the money was turned over by the insolvent to the bank; and this for the palpable reason that that was the first time the bank took any possession of the property or gave any recognizable notice to any creditor of the bankrupt of its asserted title or lien. This we hold is so both upon reason and the weight of authority.

In Wilson v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147, a debtor, more than a year prior to the filing of the petition in bankruptcy, gave to a creditor an irrevocable power of attorney to confess judgment upon a promissory note after its maturity. Within four months before the filing of the petition in bankruptcy against the debtor, the creditor obtained such a judgment and caused execution to issue thereon. The debtor having failed within five days before the sale under the execution to discharge the judgment or file a voluntary petition in bankruptcy, the court held that the judgment and execution constituted a preference by the debtor within the meaning of the bankrupt act. While this is not on the same parallel as the case at bar, it is in point as to the view entertained by the Supreme Court that such contracts are executory in character and become operative only as of the date of their fulfillment. The meat of the decision is found in this postulate:

"The act of 1898 makes the result obtained by the creditor, and not the specific intent of the debtor, the essential fact."

In Re Klingaman (D. C.) 101 Fed. 691, more than four months prior to the proceedings in bankruptcy the debtor entered into a written agreement with a creditor, to the effect that the property in question and the policies of insurance thereunder were pledged and hypothecated to the creditor as collateral security for the payment of the debt, and that he held the same subject to the demand of the creditor, with authority to the latter to take possession and dispose of the same at his discretion, for his security or reimbursement. The creditor, however, did not take possession, under the agreement, of the pledge and hypothecation until within the four months' limitation. Judge Shiras, in a forceful discussion of the question involved, held that the

transfer, or the creation of the lien, whichever it might be, under the bankrupt act, did not become effective until the beneficiary took notorious possession of the property; that sections 3 and 60 were in perfect harmony, and should be read together; and the written agreement not being of a character required to be recorded, and there being no notorious, continuous possession taken until within the four months' period, the transfer was voidable as a preference. "In other words," he said, "the intent of this section is to declare that, as against creditors of an insolvent, the limitation of time for invoking relief against a preference does not begin to run until in some form they have received actual or constructive notice [of the transfer] to the preferred creditor; and this intent is reached by the declaration that in such cases the transfer constituting the act of bankruptcy shall be held to date from the time the instrument of transfer is recorded, or the possession is taken, or notice is otherwise brought home to the creditors of the bankrupt."

In Johnson v. Huff, etc., Company, 133 Fed. 704, 66 C. C. A. 534, A. had a contract with a railroad company to furnish board to a track gang. He entered into an arrangement with a supply concern whereby it was to extend him credit, and in turn A. gave the supply house an order on the railroad company to pay to it any sums due from the railroad to him, with the agreement between A. and the house that the latter was not to present the order unless A. failed to keep up his payments. Accordingly the order was not presented for over a year, and only within one day before the contractor, being insolvent, filed his petition in bankruptcy. The court held that the order did not operate to create an equitable assignment as of the date when given, but became effective as a transfer only when presented to the railroad company; and therefore it constituted a preference within the meaning of the bankrupt act.

In English v. Ross (D. C.) 140 Fed. 630, 636, 637, deeds of real estate were given by the debtor to a creditor as collateral security for a debt, which deeds were for property situate within the state of Pennsylvania, and under the statutes of the state were not required to be recorded. Although the deeds were made more than four months before the declared bankruptcy of the debtor, they were not recorded until within the four months, whereby notice was first given to the creditors. Judge Archbald followed the decision above cited, and held that the late amendment to section 60b of the bankrupt act was intended to bring the section into practical accord with section 3, cls. "a," "b."

This view of the statute was taken in Matthews v. Hardt (Sup.) 80 N. Y. Supp. 462, 469. In that case a corporation entered into an agreement with a creditor whereby it created what the court held to be a valid equitable lien upon the property for the security of its debt. This agreement was oral, and was not of the character required to be recorded under the local statute. The lien was created more than five months before the declared bankruptcy, but within four months the creditor took possession thereunder. The court held that

the date of the act was that of taking notorious and exclusive possession, inasmuch as no notice was given to creditors in any other manner.

It is to be conceded to the defendant in error that the decision in Re Wittenberg Veneer & Panel Company (D. C.) 108 Fed. 593, by Judge Seaman, is not in accord with the foregoing view. The only fact which differentiates that case from the one at bar consists in the policy of insurance (claimed to have been pledged as collateral security) being left in the interim in the custody of the insurance agent, to be cared for and renewed from time to time, instead of being left in the possession of and collected by the debtor, as here, out of which facts the learned judge worked out an equitable lien upon the proceeds of the policy in favor of the creditor. This, it seems to us, loses sight of the imperative mandate of the bankrupt act which avoids such transfers unless publicity of the contract be given for the protection of the other creditors. It runs counter to the obvious policy of the bankrupt act to secure an equal participation pro tanto in the insolvent estate by inhibiting any act of his essential to consummate a transfer of his property to any one creditor within the four months' period, except where such claimant to the preference has, prior to the four months' limitation, put on record the instrument evidencing the preference where such recording is authorized, or where notice is given to creditors of such lien.

Deciding the case presented, our conclusion is that the judgment of the District Court must be reversed, and the cause is remanded, with directions to vacate the judgment and grant a new trial.